## In re PENNSYLVANIA CONGRESSIONAL DISTRICTS REAPPORTIONMENT CASES.

Civ. A. No. 82–0197.

United States District Court,
M. D. Pennsylvania.

March 23, 1982.

Irving L. Bloom, Westmoreland County Sol., Greensburg, Pa., for plaintiffs Ted Simon, John W. Regoli, and Robert H. Miller, individually and as the Board of Com'rs of Westmoreland County, Pa., Clarence H. Carns, Joseph H. Deeds, and Leon T. Smithley, individually and as Bd. of Sup'rs of Ligonier Tp., Westmoreland County, Pa., John E. St. Clair, Homer C. Burkett, individually and as the Bd. of Sup'rs of Fairfield Tp., Westmoreland County, Pa.

Michael T. McCarthy, Chief Counsel to Senate Democratic Floor Leader, Ronald W. Andidora, Asst., Harrisburg, Pa., for plaintiffs James R. Kelley, James E. Ross and Mark S. Singel, State Senator, of Com. of Pa.

William J. Peters, Foulkrod, Peters & Wasilefski, Harrisburg, Pa., David J. Armstrong, Eugene F. Scanlon, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for plaintiffs Doug Walgren, an individual, and the United States Representative of the Eighteenth Congressional Dist. of Com. of Pa., Ross C. Feltz, an individual; and Jese Del Gre, an individual.

Louis J. Adler, Harrisburg, Pa., for plaintiff intervenors Richard Gerber and Anna M. Miller.

Mary Ellen Krober, Deputy Atty. Gen., Harrisburg, Pa., for defendants William R. Davis, Secretary of the Com. of Pa., Richard Anderson, Com'r of Bureau of Elections for Com. of Pa., Dick Thornburg, Governor of Com. of Pa.

Fred Speaker, Larry L. Miller, Pepper, Hamilton & Sheetz, Harrisburg, Pa., for defendant intervenors The Honorable Joseph M. McDade, The Honorable Lawrence Coughlin, The Honorable Gus Yatron, The Honorable Bud Shuster, The Honorable William F. Goodling, The Honorable Robert S. Walker, The Honorable William E. Clinger, Jr., The Honorable Donald L. Ritter, The Honorable James K. Coyne, The Honorable Thomas M. Foglietta, and The Honorable Eugene V. Atkinson.

Jack H. France, Murphy, France & Vanderman, Charleroi, Pa., for defendant intervenor Austin J. Murphy.

Before WEIS, Circuit Judge, NEALON, Chief District Judge and RAMBO, District Judge.

PER CURIAM.

The 1980 census revealed a decline in Pennsylvania's population that required the number of congressional districts to be reduced from 25 to 23. After spirited and sometimes acrimonious debate, the state legislature enacted a reapportionment statute which was signed by the Governor. Act of March 3, 1982, P.L. ——, No. 42, (hereafter Act No. 42).

These consolidated cases attack the constitutionality of Act No. 42. Plaintiffs are incumbent members of Congress, prospective candidates, municipal officials, concerned citizens, and others. Additional individuals have been permitted to intervene. The plaintiffs request a declaration that Act No. 42 is unconstitutional and an injunction delaying the primary election that is presently scheduled for May 18, 1982, as well as the general election set for November 2, 1982.

This three-judge court was convened pursuant to 28 U.S.C. § 2284(a). After hearing testimony and argument on March 18, 1982, and following submission of briefs on March 22, 1982, we conclude that the request for a preliminary injunction to delay the primary election on May 18, 1982 must be denied. We reach no other issue at this time.

The plaintiffs contend that the reapportionment plan violates Art. I, § 2 of the United States Constitution and the First, Fourteenth and Fifteenth Amendments. Specifically they argue, inter alia, that there are impermissible population variances and fragmentation of municipalities. In addition, it is asserted that some districts are neither contiguous nor compact, some constituencies have not been preserved, and in certain instances the voting strength of black citizens is diluted.

The legislature began its reapportionment task by utilizing the official census figures published on April 1, 1981. These showed the state's population was 11,866,728. Based on this figure, the ideal size of a congressional district was determined to be 515,944.

After considering various plans, the legislature passed Act 42. It provides for twenty-three districts, the largest of which, the Twenty-first, has 701 persons above the ideal number. The smallest, the Ninth, has 514 below the ideal. The total numerical deviation between the two districts is 1215. Statewide, the average deviation from the ideal is 253 persons. The deviation between the largest and the smallest district on a percentage basis is .2354%.

After the Governor signed Act No. 42, it was discovered that the Census Bureau had sent revised statistics to the state's legislative data processing bureau in October 1981. The revised figures showed a population of 11,863,895 and based on this figure, an ideal district would number 515,821.5 persons. The Twenty-first district would remain the largest, with 824 persons above the ideal number. District Sixteen would become the smallest, with 1,236 persons less than the ideal. The total numerical difference between the districts would be 2,060 with an average statewide deviation of 364. Expressed in percentages, the deviation be-

tween the largest and smallest district would change to .3993%.

At the March 18 hearing plaintiffs demonstrated that the distribution of black citizens was changed by Act 42 by relocating the boundaries of the adjoining Fifth and Seventh Congressional Districts. Before reapportionment, the Seventh District contained a 10.6% black population. In the newly created district, that figure was reduced to 5.9%. In the Fifth District, before reapportionment, blacks constituted 4.6% of the population. Act 42 raised the proportion to 11.2%.

Plaintiffs also submitted an offer of proof that a witness would testify that the black population shift between the Fifth and Seventh Districts, although amounting to only 5%, in each instance would have a proportionately greater impact on the effectiveness of the black vote.

In the Fourteenth District, which is the area surrounding the city of Pittsburgh, the percentage of black citizens was reduced by reapportionment from 25.49% to 21.77%.

In Philadelphia, Act 42 reduced the number of districts wholly within the city from four to three. There are two additional districts encompassing part of the suburban areas as well. Before reapportionment, the Second District in the city had a black population of 74.7%. Act 42 raised the proportion to 80%. Before reapportionment the First District's percentage of black citizens was 44.7%. After reapportionment a new First District was created primarily by merger with the old Third. The proportion of black citizens in the new First District was reduced to 32.1%. Plaintiffs contend that the approximately 5% of black persons now included in the Second District should have been placed instead within the First District, raising its proportion to approximately 38%.

Of immediate concern to the court is the request for a preliminary injunction which would delay the primary election set for May 18, now less than two months away. The plaintiffs must show that they have a reasonable probability of success on the merits, they will suffer irreparable harm in the absence of preliminary injunctive relief, and the interest of other affected persons and the general public weigh in favor of issuance of an injunction, or at least do not militate against it. *A. O. Smith v. F.T.C.*, 530 F.2d 515, 525 (3d Cir. 1976).

Some doubt remains whether the legislature was required to consider the census revision of October 1981 or whether it was restricted to the April 1981 version which yielded a population deviation of .2354%. Without ruling on the question, we shall apply the figures more favorable to the plaintiffs' cause—those produced by the revisions of October 1981. These figures show a deviation of .3993%.

The Supreme Court has stated that in congressional reapportionment, the state must "make a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 1228–29, 22 L.Ed.2d 519 (1969) (citation omitted). The Court warned that "to consider a certain range of variances *de minimis* would encourage legislators to strive for that range rather than for equality as nearly as practicable." *Id.* at 531, 89 S.Ct. at 1229.

Despite its unwillingness to require less than absolute perfection, the Court has tolerated deviations. For example, in *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973), the Court agreed with the district court that a deviation of 4.13% was unacceptable, but held that a plan having a deviation of .149% was permissible.

In no case cited to us has a plan with a deviation as low as .3993% been found to be constitutionally infirm. Indeed, we note that in *Karcher v. Daggett,* —— U.S. ——, 102 S.Ct. 1298, 71 L.Ed.2d 635 (1982), Justice Brennan (Circuit Justice for the Third Circuit) granted a stay of an injunction against implementation of a New Jersey congressional redistricting plan where the population deviation was .6984%. *See Daggett v. Kimmelman,* 535 F.Supp. 978 (D.N.J.1982) (Three-Judge Court). It is significant that, when granting the stay, Justice Brennan, the author of *Kirkpatrick*

*v. Preisler,* noted that he believed that "there is a fair prospect of reversal" in *Daggett, supra,* 102 S.Ct. at 1300.

The *Daggett* stay order also reminded the judiciary that, "this Court has repeatedly emphasized that legislative apportionment plans are to be preferred to judicially constructed plans." *Id.* Similarly, in *White v. Weiser,* the Court said that "state legislatures have 'primary jurisdiction' over legislative reapportionment" so that "in fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" 412 U.S. at 795, 93 S.Ct. at 2354. (Citation omitted.)

■ Thus, in addition to requiring the plaintiffs to meet the usual prerequisites for the grant of a preliminary injunction, we are bound to accord appropriate recognition to the legislature's responsibility and its decisions on important state interests.

In analyzing the plaintiffs' request for a preliminary injunction, the court must weight the relative harms to the parties and the interests of the public at large. In this regard, the plaintiffs presented some evidence at the March 18 hearing and were given an opportunity to proffer other evidence in support of their positions.

With respect to balancing the equities, this court must consider the expense to the public, the disruption of campaign organizations, and the confusion which would inevitably result if at this late date the congressional primary were to be delayed. The parties agree that the costs of holding a special election would be approximately $6 million. The court also takes judicial notice that in addition to electing United States Representatives, Pennsylvania voters will be voting for nominees for Governor, Lieutenant Governor, one United States Senator, one State Supreme Court Justice, one-half of the Pennsylvania state senatorial seats and all state house seats.

In weighing the relative harms to the parties this court is guided by *Reynolds v.*

*Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which established the perimeters for remedial action in apportionment cases.

[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, *such as where an impending election is imminent and a State's election machinery is already in progress,* equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, *even though the existing apportionment scheme was found invalid.* In awarding or withholding immediate relief, *a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.* With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree. *Id.,* at 585–86, 84 S.Ct. at 1393–94 (emphasis supplied).

The Supreme Court in *Reynolds* went on to approve the district court's having declined to stay the "impending primary election" that was conducted pursuant to a reapportionment plan that the district court had found unconstitutional. *Id.* at 586, 84 S.Ct. at 1394. *See* also, *White v. Weiser,* 412 U.S. at 789, 93 S.Ct. at 2351; *Kirkpatrick v. Preisler,* 394 U.S. at 530, 89 S.Ct. at 1228.

■ In weighing the public interest and assessing the likelihood of plaintiffs' demonstrating that a .3993% population deviation is constitutionally impermissible, we conclude that a preliminary injunction should not be granted to enjoin the primary election.

Somewhat different considerations come into play in appraising the claims of racial discrimination. A reapportionment plan that is used to minimize or cancel out the voting strength of racial minorities may not pass constitutional muster even if it is acceptable under equal population standards. *See Gaffney v. Cummings*, 412 U.S. 735, 751, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298 (1972) (legislative reapportionment). The evidence and offers on the racial allegations in the case before us are not of such dimensions as to outweigh the public's interest in allowing the primary election to proceed on schedule.

The population shifts in the Seventh, Ninth and Fourteenth Districts have not caused a significant percentage shift in voter strength. Further, although plaintiffs suggested an alteration in the First District in Philadelphia which would raise the black percentage from 32.1 to 38%, it would still leave a figure substantially below a majority. On the other hand, the majority which the black citizens enjoyed in the Second District in Philadelphia is continued and enhanced in the reapportionment plan under consideration. Thus, although the plaintiffs have raised questions which merit serious consideration, the evidence produced and proffered, when weighed against the public interest in having the May primary continue on schedule, is not sufficient to warrant the entry of a preliminary injunction.

It is important that the parties understand the limited nature of our order. We do not pass on the constitutionality of Act No. 42. At this time we decide only that we will not grant a preliminary injunction postponing the May primary. Whether a permanent injunction is appropriate will be determined after further proceedings in accordance with instructions to be issued by this court.