721 F.2d 1170
 Robert E. BADHAM, Robert W. Naylor, Eric Seastrand, Aldo
Silvestri, Michael W. Cobb, Frank O. Verlot, Donna S.
Richardson, Peter Schrager, Jane Baker, Charles A. Meyer,
Kirk Lindsey, Donald Driscoll, Roger T. Erickson, D.D.S., Petitioners,
v.
UNITED STATES DISTRICT COURT FOR the NORTHERN DISTRICT OF
CALIFORNIA, Respondent,
and
March Fong Eu, Secretary of State of the State of
California, Real Party in Interest.
 No. 83-7487.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 10, 1983.
Decided Sept. 26, 1983.
Rehearing Denied Dec. 12, 1983.
 
 James R. Parrinello, Dobbs, & Nielsen, San Francisco, Cal., for petitioners.
 Robert E. Murphy, Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, Cal., Jonathan H. Steinberg, Irell & Manella, Los Angeles, Cal., Joseph Remcho, San Francisco, Cal., for respondent.
 Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, WALLACE, and PREGERSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Registered Republican voters in several congressional districts in the State of California (the Republicans) challenge California Assembly Bill 2X, a congressional redistricting bill, on several state and federal constitutional grounds. A statement of the facts is contained in the district court's disposition, which follows this opinion. Employing the doctrine of Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (Pullman ), the three-judge district court stayed the action pending resolution of the state law issues in state court. The district court retained jurisdiction to resolve any federal claims remaining following the state court adjudication. See England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 415-17, 84 S.Ct. 461, 464-465, 11 L.Ed.2d 440 (1964). We affirm.
 
 
 2
 * We are confronted initially with a question concerning the basis of our jurisdiction. The Republicans have filed both a notice of appeal under 28 U.S.C. Sec. 1291 and a petition for mandamus under 28 U.S.C. Sec. 1651. Determining which statute applies may be significant because on direct appeal we review the district court's order under an "abuse of discretion" standard, C-Y Development Co. v. City of Redlands, 703 F.2d 375, 377 (9th Cir.1983) (C-Y Development ), while under mandamus jurisdiction we employ a more stringent standard of review. See Moses H. Cone Memorial Hospital v. Mercury Construction Corp., --- U.S. ----, 103 S.Ct. 927, 933 n. 6, 74 L.Ed.2d 763 (1983); Will v. Calvert Fire Insurance Co., 437 U.S. 655, 661, 98 S.Ct. 2552, 2556, 57 L.Ed.2d 504 (1978). Furthermore, we may not exercise mandamus jurisdiction over an action which is subject to direct appeal. Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 103 S.Ct. at 933 n. 6; Helstoski v. Meanor, 442 U.S. 500, 505-08, 99 S.Ct. 2445, 2448-2449, 61 L.Ed.2d 30 (1979); Diamond v. United States District Court, 661 F.2d 1198, 1198 (9th Cir.1981).
 
 
 3
 Under some circumstances, a Pullman abstention order may be deemed a final order subject to direct appeal under 28 U.S.C. Sec. 1291. See, e.g., Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 103 S.Ct. at 933-34 (case involving Colorado River abstention); Herrington v. County of Sonoma, 706 F.2d 938, 939 (9th Cir.1983); C-Y Development, 703 F.2d at 375 (assuming jurisdiction by direct appeal). Here, however, not only has the district court retained jurisdiction to resolve the remaining federal claims, but those federal claims are substantial and constitute the essential part of the Republicans' case. The question thus arises whether an abstention order is final under these circumstances. In a recent decision, the Supreme Court touched upon but did not provide a definitive answer to this specific question. See Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 103 S.Ct. at 933-34 & n. 11.
 
 
 4
 We need not resolve the issue in this case, however, because jurisdiction clearly exists under one of the two statutes and we would affirm the district court's decision under either standard of review. We therefore proceed to the merits of the abstention issue.
 
 II
 
 5
 To determine whether Pullman abstention is appropriate, the district court must apply a three-prong test:
 
 
 6
 (1) The complaint "touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open."
 
 
 7
 (2) "Such constitutional adjudication plainly can be avoided if a definitive ruling on the state issue would terminate the controversy."
 
 
 8
 (3) The possibly determinative issue of state law is doubtful.
 
 
 9
 C-Y Development, 703 F.2d at 377, quoting Canton v. Spokane School District No. 81, 498 F.2d 840, 845 (9th Cir.1974), quoting Pullman, 312 U.S. at 498, 61 S.Ct. at 644.
 
 
 10
 Applying this test, the district court concluded that all three requirements have been met in this case. Essentially for the reasons stated by the district court, we agree. The primary dispute between the parties is whether the second Pullman requirement was met. Abstention under this requirement is appropriate if state court adjudication will obviate the need to decide all of the federal constitutional questions or "will substantially reduce the contours of such adjudication and place it in a different posture" as a result of which "the constitutional issues will have been substantially narrowed and refined." C-Y Development, 703 F.2d at 380. We conclude that the district court's decision should not be overturned on this issue.
 
 
 11
 In addition, however, the Republicans argue that Pullman abstention is not appropriate in a voting rights case, or in the alternative, that such cases require consideration of factors beyond the three basic requirements of Pullman. They stress that in this case, the congressional district boundaries must be established no later than December 15, 1983 in order to be in time for the 1984 elections. Thus, abstention and its attendant delay may here serve to invalidate the Republicans' federal voting rights. Although we disagree that these circumstances require us to reverse the district court's order, we agree that abstention orders in cases involving voting rights require special consideration.
 
 
 12
 We reject the Republicans' contention that Pullman abstention may not be applied in voting rights cases. We have stated "that there is no per se civil rights exception to the abstention doctrine." C-Y Development, 703 F.2d at 381; accord Duncan v. Poythress, 657 F.2d 691, 697 (5th Cir.1981) ("An alleged denial of voting rights does not, in itself, constitute a 'special circumstance' which automatically precludes federal court abstention."), cert. granted, 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647, cert. dismissed, --- U.S. ----, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982). Thus, the district court was correct in applying the three-part Pullman test to the case before it.
 
 
 13
 On the other hand, "the Supreme Court has demonstrated a reluctance to order abstention in cases involving certain civil rights claims, such as voting rights, ... racial equality, ... and first amendment rights of expression ...." C-Y Development, 703 F.2d at 381 (citing cases). Many courts have expressed concern that in some cases the delay caused by abstention may effectively deny plaintiffs their constitutional rights. See, e.g., Zwickler v. Koota, 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967); Baggett v. Bullitt, 377 U.S. 360, 378-79, 84 S.Ct. 1316, 1326-1327, 12 L.Ed.2d 377 (1964).
 
 
 14
 The dangers posed by an abstention order are particularly evident in voting cases. The right to vote is "fundamental 'because [it is] preservative of all rights,' " Harman v. Forssenius, 380 U.S. 528, 537, 85 S.Ct. 1177, 1183, 14 L.Ed.2d 50 (1965), quoting Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). In addition, delay in such cases is particularly insidious. In a redistricting case such as this, for example, the courts' failure to act before the next election forces voters to vote in an election which may be constitutionally defective. Although a subsequent court may strike down the apportionment plan, there is no procedure for removing from office the officials elected under the defective plan. Moreover, these officials may acquire advantages of incumbency that may be difficult for their opponents to overcome in future elections held under a constitutionally valid plan. Thus, a delayed decision in such a case "strike[s] at the heart of representative government." Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964).
 
 
 15
 Given these special dangers of delay, courts have been reluctant to rely solely on traditional abstention principles in voting cases. In Harman v. Forssenius, the Supreme Court upheld a district court's refusal to abstain in a case involving a state poll tax. The Court based its decision first on traditional Pullman considerations, concluding that the state statutes were clear and unambiguous and that state court construction of the statutes would not materially alter the nature of the problem. 380 U.S. at 535-36, 85 S.Ct. at 1182-1183.
 
 
 16
 The Court did not rest its decision on these grounds alone, however, and went on to state:
 
 
 17
 In addition to the clarity of the Virginia statutes, support for the District Court's refusal to stay the proceedings is found in the nature of the constitutional deprivation alleged and the probable consequences of abstaining. The District Court was faced with two class actions attacking a statutory scheme allegedly impairing the right to vote in violation of Art. I, Sec. 2, and the Fourteenth, Seventeenth and Twenty-fourth Amendments.... In appraising the motion to stay proceedings, the District Court was thus faced with a claimed impairment of the fundamental civil rights of a broad class of citizens. The motion was heard about two months prior to the deadline for meeting the statutory requirements and just eight months before the 1964 general elections. Given the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals, it is evident that the District Court did not abuse its discretion in refusing to abstain.
 
 
 18
 380 U.S. at 537, 85 S.Ct. at 1183 (citations and footnotes omitted). Although Harman may be distinguished, the case demonstrates the Supreme Court's concern over the special dangers inherent in applying abstention in voting cases. See also O'Hair v. White, 675 F.2d 680, 693-94 (5th Cir.1982) (en banc); Edwards v. Sammons, 437 F.2d 1240 (5th Cir.1971); cf. Anderson v. Mills, 664 F.2d 600, 603-04 (6th Cir.1981).
 
 
 19
 The fundamental importance of the right to vote and the special dangers posed to that right by delay require a different approach to abstention orders in voting rights cases. We need not decide whether this different approach is in essence a separate requirement or merely a background against which to apply the traditional three-part test. We do hold that before abstaining in voting cases, a district court must independently consider the effect that delay resulting from the abstention order will have on the plaintiff's right to vote. Although we are mindful of the important principles of federalism implicit in the doctrine of abstention, these principles may be outweighed in an individual case by the countervailing interest in ensuring each citizen's federal right to vote.
 
 
 20
 It may not be necessary to refuse to abstain in order to mitigate the dangers of delay. Instead, the district court may fashion its order in a way to reduce those dangers. The district court has done so in this case. In orally announcing its decision in this case, the court stated that the Republicans could return to the federal court if they were unable to obtain a sufficiently swift adjudication of state claims in the state courts. Thus, the Republicans were given the opportunity to petition the federal court if it becomes apparent that federal constitutional rights are endangered by the abstention order. Although the district court could have set a specific date by which the parties would have been required to return so that the district court could determine if the state court proceedings were progressing swiftly enough, reposing responsibility with the parties to advise the court is a reasonable alternative.
 
 
 21
 The district court's consideration of the delay factor and its decision whether to limit the length of time it is willing to defer are, like its ultimate decision based on the three traditional Pullman requirements, committed to the sound discretion of the district court. Here, the district court not only considered the deleterious effects of delay, but took affirmative steps to ameliorate the problem. In doing so, it adhered to established principles of federalism while also protecting the federal constitutional right to vote of California citizens. Under either applicable standard of review, we affirm its decision. The district court's abstention will have no immediate significant effect on federal voting rights. The deadline is December 15, 1983--six months after the abstention order. Therefore, as the matter presently stands, there is no immediate need for federal intervention.
 
 
 22
 Defendants argue that the Republicans themselves have been guilty of delay and have not pursued diligently their claims in state court. They contend further that absent such delaying tactics, the Republicans would have already had a swift resolution of their state law claims in state court. The argument is premature. Clearly, the district court's permission for the parties to return to federal court if necessary is predicated on a good faith effort to obtain a disposition of the state law issues in state court. Thus, if the Republicans later seek to obtain a ruling by the district court prior to action by the state courts, the district court must examine any allegations that the Republicans have not acted in good faith, especially during the time period following its abstention order. The issue will be ripe at that time.
 
 III
 
 23
 After the district court issued its opinion in this case, the Republicans petitioned the court to reconsider its decision in light of Karcher v. Daggett, --- U.S. ----, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). The district court subsequently entered an order stating that its decision was not affected by the Supreme Court's decision. We agree that Karcher does not affect the validity of the district court's order.
 
 
 24
 AFFIRMED.
 
 
 25
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEPlaintiffs, registered Republican voters in several congressional districts in the State of California, challenge California Assembly Bill 2X ("A.B.2X"), a congressional redistricting bill, on several state and federal constitutional grounds.
 
 
 26
 A.B.2X was passed by the California Senate and Assembly on December 30, 1982. Its passage was necessary because a predecessor redistricting bill, A.B. 301, had been rejected by the voters in a referendum held earlier in 1982, on June 8. The Governor signed A.B.2X on January 2, 1983, and it was chaptered. On January 5, the Elections Division of the Office of the Secretary of State transmitted copies of the chaptered bill to all Registrars of Voters and County Clerks.
 
 
 27
 Plaintiffs claim that A.B.2X involved population deviations of 3.283%, in violation of Article I, Sec. 2 of the Constitution of the United States. Those population deviations were purportedly reduced, however, by a series of rather substantial changes made in the law after its passage. On February 22, 1983,[1] a staff member of the Assembly Elections and Reapportionment Committee delivered a list of what the defendants and intervenors call "technical corrections" and census tract maps outlining the changes to the Office of the Secretary of State. The Secretary directed the changes and maps to the Registrars of Voters and County Clerks with the expectation that they will be implemented. These changes reduce the population deviation to .0538% by transferring over 39,000 persons between congressional districts. For example, the most populous district, District 16, transferred 8,593 persons to District 12, the least populous district. Plaintiffs claim that the changes were substantial and illegal. They particularly complain of the transfer between District 16 and District 12, because an amendment made to the bill just before passage, sponsored by Senator Mello, had transferred 8,576 persons from District 12 to District 16, resulting in the large deviation contained in the chaptered bill.
 
 
 28
 The plaintiffs' amended complaint, filed on March 31, 1983, alleges that A.B.2X and the "technical corrections" made to it violate several state and federal constitutional provisions. The state constitutional violations alleged include: (1) the "technical corrections" implemented by the Secretary of State violate Article III, Sec. 3 and Article XXI, Sec. 1 because the Secretary is usurping the role of the legislature; (b) the reapportionment plan was enacted in violation of Article IV, Sec. 8 because the "three-reading" rule was not followed; (3) the plan violates Article II, Sec. 9 because it contravenes the voters' intent in rejecting Proposition 10 on the June 1982 ballot; (4) the plan violates Article XXI because it does not respect city and county units and contains non-contiguous districts.
 
 
 29
 Plaintiffs allege the following federal constitutional violations: (1) the "technical corrections" implemented by the Secretary of State violate due process and equal protection; (2) the reapportionment plan's deviation percentage exceeds constitutional limits whether it is the 3.283% under A.B.2X as chaptered or .0538% as implemented by the Secretary; (3) the plan is a political gerrymander.
 
 
 30
 Because the complaint contained both state and federal claims, the defendant and defendant-intervenors brought motions asking the three-judge court to abstain from deciding the state law issues under Railroad Commission v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).
 
 
 31
 In the Ninth Circuit, Pullman abstention is appropriate when a three-prong test is satisfied: (1) The complaint "touches a sensitive issue of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." (2) "Such constitutional adjudication can be avoided if a definitive ruling on the state issue would terminate the controversy." (3) The possible determinative issue of state law is doubtful. See C-Y Development Co. v. City of Redlands, 703 F.2d 375, 377 (9th Cir.1983); Canton v. Spokane School District No. 81, 498 F.2d 840, 845 (9th Cir.1974), quoting Railroad Commission v. Pullman Co., 312 U.S. at 498, 61 S.Ct. at 644.
 
 
 32
 (1) Sensitive issue of social policy.
 
 
 33
 Reapportionment, which is carried out by the states, is an area in which state courts are encouraged to require and formulate valid plans. See Scott v. Germano, 381 U.S. 407, 409, 85 S.Ct. 1525, 1526, 14 L.Ed.2d 477 (1965) (district court should have stayed hand when Illinois Supreme Court had found the composition of the Illinois Senate invalid and retained jurisdiction to ensure a valid plan was created). The fact that a congressional apportionment, as opposed to a state legislative apportionment, is at issue in this case does not make the issue less sensitive. In both cases the federal one-person, one-vote rule applies. See Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In both cases, the Supreme Court has found that courts should defer to efforts by the legislature, as long as they are constitutional, when adopting redistricting plans. See Upham v. Seamon, 456 U.S. 37, 41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982); White v. Weiser, 412 U.S. 783, 794-95, 93 S.Ct. 2348, 2354-2355, 37 L.Ed.2d 335 (1973) ("In fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.' ") (quoting Whitcomb v. Chavis, 403 U.S. 124, 160, 91 S.Ct. 1858, 1877-1878, 29 L.Ed.2d 363 (1971)). Although the plaintiffs argue that three-judge courts have not abstained in congressional reapportionment cases, none of the cases cited by plaintiffs involved state law issues that would obviate or alter the federal constitutional issue (the second Pullman criteria). See Flateau v. Anderson, 537 F.Supp. 257 (S.D.N.Y.1982); In re Congressional Districts Reapportionment Cases (N.D.Ill.1982) (Exhibit C to Plaintiffs' Opposition to Motion to Abstain); In re Pennsylvania Congressional Districts Reapportionment Cases, 535 F.Supp. 191 (M.D.Pa.1982); Carstens v. Lamm, 543 F.Supp. 68 (D.Colo.1982).
 
 
 34
 (2) Avoidance or alteration of the federal constitutional issue.
 
 
 35
 To satisfy the second prong of the Pullman criteria, a state court determination need not entirely avoid the federal issue. It is enough that it materially alter the nature of the federal constitutional question. See C-Y Development Co. v. City of Redlands, 703 F.2d at 377-380 (abstention might avoid deciding proper remedy for permanent deprivation of property rights, leaving only question of remedy for temporary taking); see also Bellotti v. Baird, 428 U.S. 132, 146-47, 96 S.Ct. 2857, 2865-2866, 49 L.Ed.2d 844 (1976) ("abstention is appropriate where [deferral to the state courts] '... might avoid in whole or in part the necessity for federal constitutional adjudication, or at least materially change the nature of the problem.' ") (quoting, Harrison v. NAACP, 360 U.S. 167, 177, 79 S.Ct. 1025, 1030, 3 L.Ed.2d 1152 (1959)).
 
 
 36
 In this case, an issue of state law presents a threshold question which will materially alter the federal constitutional question presented. The plaintiffs have claimed in Count VII of their complaint that the "technical corrections" implemented by the Secretary of State violate the state constitution. A decision on this state law issue will determine whether the three-judge court reviews the reapportionment plan with or without the challenged changes. With the changes the reapportionment plan, according to defendants, has a population deviation of only .0538%--a deviation percentage below that which the Supreme Court has found constitutional.[2] The unchanged, or original plan, in contrast, is more in doubt. Its population deviation of 3.283% comes closer to deviations found constitutionally violative.[3] Since this case presents a state law issue which will materially alter the federal constitutional issue, the second prong of Pullman is satisfied.
 
 
 37
 This case also presents three state constitutional law questions that may obviate the federal constitutional issue. Plaintiffs argue that the reapportionment plan violates the "three-reading" rule (Article IV, Sec. 8); that it contravenes the voters' intent in rejecting Proposition 10 (Article II, Sec. 9); and that the plan does not respect city and county units and is non-contiguous (Article XXI). If A.B.2X is found invalid because it violates the California Constitution for any of the above reasons, the federal constitutional questions will become moot. These state law issues thus provide additional reasons for finding the second prong of Pullman satisfied.
 
 
 38
 (3) Doubtfulness of the state law issues.
 
 
 39
 To satisfy the third prong of Pullman, the possibly determinative state law issues must be doubtful. See C-Y Development Co. v. City of Redlands, 703 F.2d at 380-381; Pue v. Sillas, 632 F.2d 74, 78-79 (9th Cir.1980). A state law issue is doubtful if it is "susceptible" of an interpretation that would avoid or modify the federal constitutional question. See Babbitt v. Farm Workers, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979); Bellotti v. Baird, 428 U.S. 132, 146-47, 96 S.Ct. 2857, 2865-2866, 49 L.Ed.2d 844 (1976).
 
 
 40
 The legality of the Secretary of State's implementation of the changed reapportionment bill is an issue of first impression in California. No California case law or state statute provides a clear answer.
 
 
 41
 Plaintiffs argue that the "technical corrections" are in fact substantive amendments to A.B.2X and constitute an unconstitutional exercise by the Secretary of the Legislature's power to redistrict. They allege that the Secretary's implementation violates Article XXI, Sec. 1 of the California Constitution ("In the year following the year in which the national census is taken ..., the Legislature shall adjust the boundary lines of the ... Congressional ... districts ...."). They also allege that the Secretary is in violation of Article III, Sec. 3 ("The powers of the state government are legislative, executive and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.").
 
 
 42
 Defendants offer two theories in response, arguing that California Supreme Court precedent allows a reapportionment statute to be construed to include technical corrections; and that Cal. Elections Code Sec. 30000 permits them. Neither theory is without doubt, however. In adopting temporary reapportionment plans, the California Supreme Court has allowed incorporation of technical corrections in order to carry out legislative intent. See Silver v. Brown, 63 Cal.2d 841, 844-46, 48 Cal.Rptr. 609, 409 P.2d 689 (1966) (maps and census tracts contained errors which constituted a departure from the legislative history); Legislature v. Reinecke, 6 Cal.3d 595, 604, 99 Cal.Rptr. 481, 492 P.2d 385 (1972) (Reinecke I ) (18 clerical errors corrected because the language of the legal descriptions departed from the maps and computer printouts relied upon by the legislature in passing the bill). It has also allowed clerical corrections made by special masters who drew up a reapportionment plan. See Legislature v. Reinecke, 10 Cal.3d 396, 401, 110 Cal.Rptr. 718, 516 P.2d 6 (1973) (Reinecke IV ). And, the court has allowed the temporary use of a judicial plan which included, according to defendants, corrections somewhat similar to those made in the plan at issue here. See Assembly v. Deukmejian, 30 Cal.3d 638, 180 Cal.Rptr. 297, 639 P.2d 939 (1982). Silver, Reinecke I, and Reinecke IV, however, were not faced with the question at issue here: whether post-enactment changes, including shifts in population among districts to more closely comply with the one-person, one-vote standard, can be made other than by the legislature, particularly when there is evidence that legislative intent may have been something quite different. And Deukmejian expressly did not pass on the merits of the apportionment plan implemented by that case.
 
 
 43
 The application of Elections Code Sec. 30000 is similarly doubtful here. The statute provides:
 
 
 44
 "Any maps describing the boundaries of the districts, as contained in this division, which have been prepared by the Legislature or a committee of the Legislature in connection with the enactment of this division may be deposited with the Secretary of State in order to illustrate the boundary lines set forth in this division. Maps deposited with the Secretary of State pursuant to this section may be used by the Secretary of State and the several county clerks for the purposes of assisting in the interpretation of this division and to facilitate the Secretary of State and county clerks in their administrative functions involved in the conduct of elections."
 
 
 45
 Plaintiffs argue that Elections Code Sec. 30000 does not permit the Secretary to adopt congressional districts that depart from the language of the bill as chaptered. Defendants offer a different interpretation. They argue that the statute's provision for the Secretary's interpretation is license for departure from the literal words of the bill as chaptered; that the Secretary has interpreted the bill to include the "technical corrections" and that her interpretation should be given deference; and that the legislature passed this statute with the knowledge that its identical predecessor had been interpreted similarly. These differing constructions of the statute put its application to this case in doubt.
 
 
 46
 Since Elections Code Sec. 30000 may be "susceptible" of an interpretation that would modify the federal constitutional question, the third prong of the Pullman test is satisfied.
 
 
 47
 Some of the other state law issues involved in this case are also doubtful. Plaintiffs argue that A.B.2X is void because it violates the "three-reading" rule of Article IV, Sec. 8 of the California Constitution. It will be necessary to decide whether People v. Peete, 54 Cal.App. 333, 369, 202 P. 51 (1921) (rejecting a challenge to an earlier three-reading rule) controls the present case.
 
 
 48
 Plaintiffs also attack A.B.2X as violative of Article II, Sec. 9 of the constitution because it contravenes the voters' intent in rejecting Proposition 10. The California Supreme Court has said the new measure must be "essentially different" from the rejected provision and enacted "not in bad faith, and not with intent to evade the effect of the referendum petition." Assembly v. Deukmejian, 30 Cal.3d at 678, 180 Cal.Rptr. 297, 639 P.2d 939. Lower California courts have applied this test. See Martin v. Smith, 176 Cal.App.2d 115, 119-21, 1 Cal.Rptr. 307 (1959). In Martin, application involved comparing the two bills, discerning the intent of the voters in rejecting the first bill, and assessing the legislature's motive in passing the second bill. The outcome of such an inquiry is certainly not clear, and in any event, involves sensitive issues of state policy.
 
 
 49
 Plaintiffs' final state law argument is that the A.B.2X is invalid because it does not respect city and county units and is noncontiguous. Although a recent case discusses similar issues in assessing a reapportionment plan, see Carstens v. Lamm, 543 F.Supp. 68, 82 (D.Colo.1982), the plaintiffs are alleging a violation of Article XXI, Sec. 1, which has yet to be interpreted by a state court.
 
 
 50
 The rationale of Pullman applies most persuasively here. We shall abstain until the state law issues are settled by the state court. We shall, however, retain jurisdiction to resolve whatever federal issues remain.
 
 Dated:
 
 51
 /s/Cecil F. Poole
 
 Cecil F. Poole
 United States Circuit Judge
 
 52
 /s/Alfonso J. Zirpoli
 
 Alfonso J. Zirpoli
 United States District Judge
 
 53
 /s/Robert H. Schnacke
 
 Robert H. Schnacke
 United States District Judge
 
 
 [1]
 This action was begun on March 4, 1983; there apparently was no public notice of the purported changes until some date thereafter, when the Secretary of State sent them to the various county officials. Thereafter plaintiffs filed their amended complaint
 
 
 [2]
 There is no total percentage deviation that automatically makes a reapportionment plan constitutional. See Kirkpatrick v. Preisler, 394 U.S. 526, 530-31, 89 S.Ct. 1225, 1228-1229, 22 L.Ed.2d 519 (1969). The plan must achieve one-person, one-vote as nearly as practicable. See Wesberry v. Sanders, 376 U.S. 1, 7-8, 84 S.Ct. 526, 529-530, 11 L.Ed.2d 481 (1964). The Supreme Court, however, has approved a plan with a total percentage deviation of .149%. See White v. Weiser, 412 U.S. 783, 786, 796, 93 S.Ct. 2348, 2350, 2355, 37 L.Ed.2d 335 (1973)
 
 
 [3]
 A total percentage deviation of 4.13% has been found to violate the constitution. See White v. Weiser, 412 U.S. 783, 785, 790-91, 93 S.Ct. 2348, 2350, 2352-2353, 37 L.Ed.2d 335 (1973). One three-judge panel has approved a plan with a percentage deviation of 3.79%. See Drum v. Scott, 337 F.Supp. 588 (M.D.N.C.1972). However, the fact that the legislative committee was able to draft a plan with a lower percentage deviation makes A.B.2X's 3.238% deviation suspect. See White v. Weiser, 412 U.S. at 790, 93 S.Ct. at 2352 (the existence of proposed plans with lower total deviations indicated that it was possible and practicable to construct a redistricting scheme with lower populations among districts)